## THE EVERETT FOWLER.

### CONNERS MARINE CO., Inc., v. GRACE IRON & STEEL CO., Inc.

### GRACE IRON & STEEL CO., Inc., v. CONNERS MARINE CO., Inc.

### Nos. 13720, 13886.

District Court, E. D. New York.
April 25, 1934.

Purdy & Purdy, of New York City (Edmund F. Lamb, of New York City, of counsel), for libelant and cross-respondent.

Max Rockmore, of New York City (Adolph Greenberg, of New York City, of counsel), for respondent and cross-libelant.

GALSTON, District Judge.

It was stipulated that the libel and cross-libel be tried together on the same record.

The libel seeks to recover damages to the scow Everett Fowler, which were sustained by her while under charter to the Grace Iron & Steel Company, Inc. The cross-libel seeks to recover for the loss of a cargo alleged to have resulted from the listing of the Everett Fowler and the dumping of its cargo on February 2, 1933.

The scow Everett Fowler was delivered, in accordance with the charter, on January 23, 1933. The scow was brought to the south side of the pier at South Fifth street, Brooklyn, next to the bulkhead on January 25th at about 4:30 p. m. From the time of delivery under the charter, the scow was under the control of the Grace Iron & Steel Company, Inc., and the loading was carried on likewise under its control. The loading of the vessel, consisting of steel rails, some of it heavy steel, began on the following morning. The steel was brought to the dock by truck, which was backed up against the stringpiece. It was thrown by hand from the truck to the boat.

The loading continued on Wednesday morning and throughout Wednesday, and the cargo was placed on the starboard side of the scow and put alongside the rail. By Wednesday night the cargo had reached the edge of the rail, and the boat had a list to starboard. The boat was then turned around, the trimmers employed by the Steel Company putting the lines out.

Lines were run over to the Don at one end, and the tide was falling and took the boat out at the other end, the truck taking the line and pulling the end up with the truck. The port side was loaded on Thursday and Friday. On Thursday the trimmers put stanchions on the starboard side of the boat. These stanchions consisted of ends of steel rails and steel girders, and were about five or six feet in length. The lower ends of the stanchions came down to the deck of the scow. The top of the stanchions projected from the side of the boat three or four inches. The stanchions were from six inches to a foot apart.

Before the stanchions had been erected on the starboard side, the captain of the barge said to one of the respondent's officers that stanchions ought to be put up before they loaded the boat with too much iron. The reply was that the men were too busy and that there was ample time for erecting the stanchions. However, after the stanchions were put up, the captain complained and predicted trouble. Apparently Ganz realized that the stanchions had been erected improperly and reprimanded the trimmers. Their reply was that they had not been given a chance to build fences when the operation of loading started, saying to Ganz, "You wanted us to stay there and trim the boat." An effort was made to change the stanchions, but too much iron had been loaded and the trimmers could not move the stanchions.

Loading continued up to the day of the accident. The boat lay on the starboard side to the dock at that time.

The tide was coming up, and Erickson told Ganz that the stanchions would catch the stringpiece. At that time the top of the rail of the boat extended about four feet below the stringpiece of the dock. There were two stringpieces; about four feet separated them. The rail of the boat extended twenty-two inches above the deck.

At 12 o'clock, one of the stanchions caught under the top stringpiece. The cap-

tain notified an employee of the respondent and warned him of approaching trouble. Subsequently, one of the trimmers tried to release the stanchion. The on-coming tide caused several of the stanchions to be caught under the stringpiece, and they could not be loosened. The scow was thus held for a couple of hours. Efforts were made to remedy the situation by placing some of the heavy girders fore and aft instead of athwartships. Meanwhile the list to starboard was increasing, and finally the load started to slide into the river. This took the rail and the side-log. The boat then drifted out, the stanchions having all gone overboard; and all lines, save the stern line, had parted, after which the boat was lying crosswise.

Though there is a conflict of testimony in the case, I find that the dumping was caused entirely by improper positioning of the stanchions; and that there were no unusual swells or water conditions which brought about the accident.

I was impressed by the manner in which the captain told his story, and his version is certainly much more plausible than that presented by the witnesses for the Grace Iron & Steel Company. I am not convinced that the captain cast off the lines prior to the dumping of the load, as the respondent contends. Moreover, there is substantial contradiction in the stories of Ganz, King, and Barton as to the time that the captain was supposed to have thrown the lines, and none of them agrees with the testimony of Folk, one of the trimmers, as to the time when the captain was loosening the line; and I am more ready to accept the testimony of Mc-Donough, who testified that the lines were made fast until the cargo slid off. McDonough, the master of the Don, was a disinterested witness. That boat was lying on the south side of the Fifth street pier out near the river. This witness saw the Everett Fowler overturn, and testified that she had both side lines and cross lines to hold her to the bow. He could not very well see the stern lines. This witness also corroborates the captain in that he saw one of the trimmers pulling out one of the uprights or stanchions before he went to lunch at 12 o'clock. After that he saw the stanchions caught under the stringpiece prior to the accident. He contradicts respondent's witnesses by saying that there were no unusual water conditions or swells at that time, and that his own boat was neither rocking, pitching, nor pounding against the dock.

Evaluating the testimony, as was done in Bushey v. Huron Stevedoring Company (C. C. A.) 56 F.(2d) 604, 1932 A. M. C. 417, I accept the version of the accident as related by Erickson and McDonough.

The respondent Grace Iron & Steel Company, Inc., sought to show that the unseaworthy condition of the scow contributed to the disaster. I can find no credible proof that that was the fact. Even Gardner, who testified on behalf of the respondent, admitted that the condition of the rail was not bad, though he found the deck frame ends, beams, and carlings rotten in places. McGrath, the surveyor representing the libelant, admitted that a few of the cross deck beams had soft spots on the ends. These were small in area, not exceeding two inches in length, the cross-beams being 12 by 12, and the intermediates being 6 by 12. The softness found was not sufficient materially to weaken the beams, and of course the soft spots had no effect upon the strength of the rail. The captain testified that before the boat was delivered to the charterer he had had her on various voyages, had inspected and sounded her daily, and found no broken planks or timbers, and that the rail was in first-class condition.

Accordingly, I find that the libelant is entitled to an interlocutory decree; and that the cross-libel should be dismissed.